# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 3, 2024

Lyle W. Cayce
Clerk

———————————

No. 23-20144

———————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Lee Roy Villarreal,

*Defendant—Appellant*.

————————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:15-CR-566-1

————————————————————————

Before Ho, Engelhardt, and Douglas, *Circuit Judges*.
Per Curiam:[*]

Appellant Lee Roy Villarreal appeals the district court's denial of his request to admit as trial evidence a recorded interview of a government co-operator who implicated Villarreal in a kidnapping conspiracy; request to call the cooperator as a witness to elicit testimony about the recorded interview; motion for the court to immunize the cooperator for testimony; and motion to dismiss his indictment.  We AFFIRM.

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-20144

# I

Villarreal was charged in a superseding indictment with three counts: conspiracy to possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A); conspiracy to kidnap, in violation of 18 U.S.C. § 1201(c), (a)(1); and kidnapping, in violation of 18 U.S.C. § 1201(a)(1), (2).  A fourth count for using, carrying, and brandishing a firearm, in violation of 18 U.S.C. § 924(c)(1)(A), (iii), was dismissed at the Government's request.  Villarreal's kidnapping charges stemmed from the Government's claim that he was involved in a kidnapping allegedly organized by members of the Gulf Cartel around May 2011.

During trial, the Government listed Victor Alfonso Romero as a potential witness.  After being arrested for an unrelated drug trafficking offense in Victoria, Texas, Romero was interviewed three times by government agents between June 2018 and August 2019.  The Victoria investigation involving Romero was distinct from Villarreal's case, as it pertained to Romero's role in distributing marijuana with a criminal association known as the "Beltran drug trafficking organization."  The first two interviews were handled by agents involved in the Victoria investigation only, while the third interview was conducted by agents who were also involved in Villarreal's case.  Romero is central to this appeal, as Appellant challenges the district court's denial of Appellant's request at trial to permit Romero's testimony and admit a recording of the second interview.  Appellant describes these as evidence relevant for showing the jury that government actors coerced witnesses into testifying against Villarreal.

The first interview occurred on June 30, 2018, in which Romero was questioned by Homeland Security Investigations Special Agent Steven Greenwell about the kidnapping.  Romero did not inculpate or exculpate Villarreal during this interview.  Neither the recording nor the report of

2

investigation referred to any photos being shown to Romero, or any questions asked of him regarding Villarreal.

The second interview took place as a proffer on August 28, 2018, where Romero was questioned for ten minutes by Greenwell and Assistant United States Attorney Patty Booth in the presence of his then-defense attorney. Though this interview was recorded, no investigation report was provided to the district court. During this discussion, Greenwell brought up the kidnapping to Romero and said, "The FBI would really rather have you as a witness than a defendant." Before Romero could fully respond, Booth said, "Just listen to what he has to say, then talk to your attorney." Greenwell went on to mention Romero's prior confession to being involved in the kidnapping. The agents said the FBI believed Romero could identify Villarreal as being attached to the kidnapping as well, and that he could be a witness at Villarreal's trial. Booth said no one wanted to charge Romero for kidnapping, but agreeing to be a witness in Villarreal's case could be "one more thing" that contributes to any benefit Romero may receive for cooperating. The agents encouraged Romero to tell the truth to avoid future consequences that could arise from withholding information.

Romero stated that he knew of Villarreal. When asked whether Villarreal was at the kidnapping, Romero responded, "I need to think about it." He later said, "There [were] a lot of guys there," and that Villarreal "might have been" at the kidnapping. Romero also referenced photographs of Villarreal that were purportedly shown to him at some point previously, saying he did not recognize the photographed individual. Greenwell instructed Romero to "discuss with [his defense attorney] after [the interview] if [he] would like to sit down and talk to the FBI, before they approach [him] in an entirely different fashion." Towards the end of the interview, Romero's attorney asked if the agents needed something "more incriminating" about Villarreal, to which Booth answered, "Yeah."

No. 23-20144

The third interview happened one year later on August 28, 2019, and was unrecorded. There, Greenwell and FBI Special Agent Christopher Lee questioned Romero about the kidnapping and Villarreal's involvement. In Appellant's view, Romero implicated Villarreal during this interview because he gave facts about "Villarreal eerily similar to those told to him by the agents in the August 2018 meeting." Romero also identified a picture of Villarreal, but it is unknown whether this was the same picture referenced in the August 2018 interview.

At trial, before the jury was brought in, the Government notified the district court that it would not call Romero to testify, but Villarreal could do so if he chose to. Appellant sought to call Romero and requested that the court admit the recording of the second interview for the jury to hear. He asserted that merely cross-examining Romero on the transcript of the interview would be insufficient for conveying the emotion of the discussion and showing how Romero was pressured by the agents to inculpate Villarreal in the kidnapping—thus, admitting the recording was required. The Government countered that admitting this extrinsic evidence was unnecessary because Appellant could ask Romero on the stand whether he felt pressured by the agents. The court took the matter under advisement. Meanwhile, Romero was brought to the courthouse and appointed counsel.

Revisiting the topic of the recording's admissibility, Appellant posited to the district judge that the recording showed how the agents "worked [Romero] over" in the second interview by conveying to him, in Appellant's words, that "[t]he FBI wants you to be a witness, not a defendant. So you come clean with us and we'll report that back to the FBI." According to Appellant, during the second interview, Romero denied knowledge of Villarreal's involvement in the kidnapping multiple times after being pressed to implicate Villarreal by the agents. Appellant says the agents' coercive tactics caused Romero to switch his story by later inculpating Villarreal in the

4

kidnapping during the third interview.  Doubting the recording's relevance, the judge noted that Appellant had "no evidence that this ever happened in any other case, any other instance."  Appellant responded that the interviews of the other witnesses in Villarreal's trial were not recorded, to which the judge said that Appellant could have questioned those witnesses about whether they were pressured by agents.  The Government underscored that the Romero interview recording arose from a separate investigation and was led by government actors who were not involved in Villarreal's case.  The judge stated he would not let Appellant use the recording to bolster a theory to the jury that every witness in Villarreal's case was coerced by the Government during their interviews.  Nonetheless, Appellant sought to use the recording for the purpose of showcasing to the jury that "we don't know what happened with every witness" because their interviews were not recorded.  The district court deferred ruling on the matter.

During Appellant's case-in-chief, Romero's appointed counsel told the district court that Romero would invoke his Fifth Amendment privilege against self-incrimination if called to testify.  The judge aligned with Romero's concern for self-incrimination.  He highlighted that, after putting Romero on the stand, Appellant "would convince him to testify contrary to what he told the government, which would be a crime."  Appellant then moved for the court to immunize Romero "so that he would not be subject to prosecution . . . and so his testimony could be made available to the jury."  Appellant also filed a trial memorandum requesting any of the following remedies: (1) admission of the recording and an order that Romero must testify with "use immunity" despite asserting his Fifth Amendment privilege; (2) admission of the recording and testimony from Agent Lee that the August 2019 interview was the first time Romero implicated Villarreal in the kidnapping; or (3) dismissal of the indictment against Villarreal.  The court orally denied Appellant's requests but permitted him to call Agent Lee as a witness.

No. 23-20144

The court noted it would issue a written memorandum opinion providing its reasons for the denial.

Several individuals testified at Villarreal's trial about their involvement in the kidnapping. Some implicated Villarreal, and others did not. The jury found Villarreal guilty of conspiracy to distribute a controlled substance but acquitted him on the counts for conspiracy to kidnap and kidnapping. He received a varied sentence of 180 months' imprisonment and five years of supervised release.

After sentencing, the district court issued a memorandum opinion expanding on its denial of Appellant's requests to admit the recording, immunize Romero for testimony, or dismiss the indictment. The court opined that district courts have no inherent power to grant immunity. Even if the possibility of a district court granting immunity has been left open, Villarreal did not establish the "extraordinary circumstances" necessary to justify that exercise of authority. The district court also found that evidence of government agents ostensibly pressuring Romero to implicate Villarreal—during an interview of a witness not called by the Government in Villarreal's case, for an investigation distinct from Villarreal's case, and conducted by agents not involved in Villarreal's case—was irrelevant. Moreover, the court highlighted that, notwithstanding any error, the issue of Romero's immunity for testimony pertaining solely to the kidnapping charges was mooted by the jury's acquittal of Villarreal on all kidnapping-related counts.

Appellant now appeals from the district court's denial of his trial memorandum requests.

## II

Appellant first argues the district court erred by refusing to admit a partial recording of Romero's second interview, led by Greenwell and Booth. We review a district court's decision to admit or exclude evidence for abuse

6

of discretion. *United States v. Okulaja*, 21 F.4th 338, 344 (5th Cir. 2021) (quoting *United States v. Ibarra*, 493 F.3d 526, 532 (5th Cir. 2007)). Discretion is abused when the district court's decision is based "on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Alaniz*, 726 F.3d 586, 606 (5th Cir. 2013) (quoting *United States v. Ragsdale*, 426 F.3d 765, 774 (5th Cir. 2005)).

Under Federal Rule of Evidence 402, irrelevant evidence is not admissible. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. FED. R. EVID. 401. Essentially, "the evidence must be probative of the proposition it is offered to prove," and "the proposition to be proved must be one that is of consequence to the determination of the action." *United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981).

Appellant contends that Romero's second interview recording was relevant "because it showed how the government would and did coerce a witness, Romero, who did not initially incriminate Villarreal." In other words, Appellant argues the recording was relevant for enabling the jury to determine if the agents who interviewed witnesses for Villarreal's case employed coercive practices to sway testimony as Appellant alleges the agents who handled Romero's interview did.

The district court did not err in finding that "any alleged misconduct toward Romero on the part of government agents was irrelevant." Romero did not testify against Villarreal. Even if it is debatable that any language used by the agents during Romero's interview was "coercive" in nature and affected his recount of the kidnapping, Appellant put forth "no evidence that the Government engaged in similar interrogation tactics against any actual witnesses" who testified at Villarreal's trial. Notably, Appellant could have questioned any of the Government's testifying witnesses, totaling over thirty,

about whether they were pressured or coerced into implicating Villarreal. Appellant either failed to do so—which is puzzling given his position that a determination of whether witnesses were coerced was "crucial" to his case—or did not gain favorable testimony. In fact, Appellant took the liberty of calling Agent Lee (who joined Agent Greenwell in questioning Romero during the third interview in August 2019) to the stand, but never asked Lee about Romero or whether any witness was pressured to inculpate Villarreal in this case. Appellant also called FBI Special Agent James Matthew Moody, who interviewed many of the testifying witnesses who participated in the kidnapping, yet never inquired if Moody or any other agents pressured those witnesses to testify against Villarreal.

Appellant's base argument—that one instance of purported witness coercion from a separate investigation is relevant for demonstrating that witness coercion happened across-the-board in Villarreal's case—is attenuated as is. But the gap stretches further with two additional observations. First, the portion of the recording containing the allegedly coercive statements that Appellant sought to admit discussed only Romero's knowledge of Villarreal's alleged involvement in the *kidnapping*, not his drug charges. Second, the jury acquitted Villarreal on all kidnapping-related charges. This adds another layer to the unconvincing essence of what appears to be Appellant's position on appeal: that snippets of one witness interview on an isolated topic, regarding charges for which Villarreal was acquitted, is relevant for showing that a host of other witnesses may have been coerced as it pertains to their testimony regarding drug charges for which Villarreal was actually convicted.

Appellant's reference to an out-of-circuit case, *United States v. Shyllon*, 10 F.3d 1 (D.C. Cir. 1993), to support the proposition that evidence does "not have to establish every link in the chain of proof to be relevant" is unhelpful to his appeal. Along with being nonbinding, that case is distinguishable. There, the defendant claimed that a government investigator

coerced the alleged victims of an extortion scheme into testifying against him. *Shyllon*, 10 F.3d at 3. As support, the defendant sought testimony from a witness who would have said the *same* investigator threatened him with prosecution if he did not testify against the defendant. *Id.* The D.C. Circuit reversed the district court's exclusion of the testimony as irrelevant. *Id.* at 4 ("Surely testimony that the investigator had intimidated [the defendant's witness] bears on the probability that he had also intimidated the Government's witnesses."). A key distinction between *Shyllon* and the instant case is that, in the former, a clear link in the chain of proof existed since the same government actor conducted both allegedly coercive interviews. Put differently, there is no evidence that the agent and prosecutor who led Romero's second interview, for a separate investigation, had any proximity to the interviews of the many testifying witnesses in Villarreal's case—leaving Appellant with no causal link akin to that in *Shyllon*.

Overall, the district court was proper in its assessment: "Evidence of allegedly abusive conduct, as to a putative witness the Government did not call, conducted by different agents in a different case in a different division of this Court is totally irrelevant, absent some evidence connecting it to the witnesses that did testify. No such evidence exists." Any tendency of the Romero recording to make it more or less probable that the testifying witnesses were intimidated by the Government into falsely inculpating Villarreal is speculative at best. Therefore, the district court did not err by excluding the recording on relevancy grounds.[1]

---

[1] As we hold the district court committed no error in excluding the recording because it was irrelevant in its entirety, we need not reach Appellant's contention that the recorded statements were not hearsay and that the district court could have redacted the recording, limited its scope, or provided limiting jury instructions.

## III

We next consider Appellant's challenge to the district court's disallowance of Romero's testimony after he asserted his Fifth Amendment privilege against self-incrimination. He contends that the district court erred by allowing Romero to make a "blanket" assertion of the Fifth Amendment privilege instead of making a particularized inquiry into the scope of the privilege assertion.

We review a district court's exclusion of a witness from testifying based on his invocation of the Fifth Amendment privilege for abuse of discretion. *United States v. Hankton*, 51 F.4th 578, 604 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 839 (2023) (quoting *United States v. Brooks*, 681 F.3d 678, 711 (5th Cir. 2012)). Though the district court's discretion is not unlimited, "it must enjoy wide discretion in resolving a self-incrimination claim." *Brooks*, 681 F.3d at 711 (citation omitted). "Generally, an abuse of discretion only occurs where *no reasonable person* could take the view adopted by the trial court." *Id.* at 711 (citation omitted).

Once a witness invokes his Fifth Amendment privilege, the district court should inquire into the legitimacy and scope of the invocation. *United States v. Wright*, 845 F. App'x 334, 337 (5th Cir. 2021). Blanket refusals to testify upon invoking the privilege are unacceptable. *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976). However, a district court's acceptance of an invocation without further questioning is permissible when the district court is presented with sufficient evidence from which to understand the likely implications of the witness's testimony and the scope of his privilege. *Wright*, 845 F. App'x at 337–38.

We are not convinced the district court exceeded its discretion because there was ample evidence from which the district court comprehended the likely implication of Romero's testimony and the scope of his Fifth

Amendment privilege. The district court's observation of the two potential paths for Romero's testimony is pertinent. On one hand, Romero could have taken the stand and admitted he lied to the agents during the third interview when he said Villarreal was involved in the kidnapping. Appellant concedes that this path was most probable. Indeed, this outcome would have aligned with Appellant's stated goal for questioning Romero: convincing him to "come clean" and retract his prior statements by exculpating Villarreal on the stand. As the district court rightly observed, this path of testimony was problematic in that it "would serve to incriminate Romero by exposing him to liability for lying to the government agents at the August 2019 interview."

On the other hand, Romero's testimony could have remained consistent with his statements in the third interview implicating Villarreal in the kidnapping. It is unlikely that Appellant intended this scenario because it would effectively inculpate Villarreal. Moreover, such testimony would still surface an issue of self-incrimination from Romero alluding to his own involvement in the kidnapping by attesting to his knowledge of Villarreal's presence. In its memorandum opinion, the district court diligently assessed the potential avenues of Romero's testimony. It concluded that Appellant's true desire for seeking to put Romero on the stand was to open the door for impugning him against the second interview recording, thereby enabling the jury to hear the recording and launching Appellant's notion of wholesale government coercion. We agree. After all, the coercion theory permeates through Appellant's briefing. And we have already determined that Appellant's supposed evidence in support of that theory was irrelevant. *See* Part II, *supra*.

The district court did not permit a blanket invocation of the Fifth Amendment privilege. Rather, the court's assessment showed that it sufficiently considered the record—namely, Appellant's express purpose for seeking to contradict Romero's prior statements, the most probable outcome

of Romero's testimony, and the likelihood for self-incrimination—to grasp the implications of putting Romero on the stand. This analysis was adequate under our precedent for the district court to sustain Romero's assertion of privilege without further inquiry, despite that it was unknown precisely how Romero would testify. *Wright*, 845 F. App'x at 337–38

Appellant's briefing on this issue suggests a secondary argument that Romero's invocation of the Fifth Amendment privilege would have protected him against the use of his testimony in future proceedings. Thus, Appellant seems to assert that the district court abused its discretion by not commanding Romero to testify because "he would have been protected from self-incrimination even without a judicial order." This argument arises from Appellant's misplaced reliance on *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52 (1964), *abrogated on other grounds by United States v. Balsys*, 524 U.S. 666 (1998). There, the petitioners appealed from being held in contempt of court because they invoked their Fifth Amendment privilege and would not testify in a state administrative hearing after being immunized under state law. *Murphy*, 378 U.S. at 53–54. The Supreme Court announced the rule that a state witness could be compelled to give testimony which may be incriminating under federal law because the federal government was "prohibited from making any such use of compelled testimony and its fruits." *Id.* at 79. Appellant's reliance on *Murphy* to support his secondary argument is unfitting because, unlike the petitioners in that case, Villarreal never received a grant of immunity, was not being held in contempt, and did not refuse to testify in the face of a court order. *See id.* at 53–54. Further, Villarreal's case does not present the same issue of witness immunity carrying over between state and federal jurisdictions that was central in *Murphy*. *See id.* Thus, *Murphy* is distinct and unsupportive of Appellant's assertion that the district court should have ordered Romero's testimony over his sound invocation of the Fifth Amendment privilege and despite no grant of immunity.

For these reasons, the district court did not go beyond its discretion by sustaining Romero's assertion of the Fifth Amendment privilege and declining to let him testify.

## IV

Appellant further argues the district court abused its discretion by refusing to immunize Romero so he could testify without having to invoke his Fifth Amendment privilege. Appellant inaptly faults the district court for not granting judicially-ordered immunity—a practice we have repeatedly deemed outside of the judiciary's authority as a general matter—to "stem government abuse" that did not occur.

"This Circuit has consistently held that a district court does not possess the statutory, common law, or inherent authority either to grant use immunity to a defense witness . . . or to order the government to do so." *United States v. Chagra*, 669 F.2d 241, 258 (5th Cir. 1982) (citation omitted), *overruled on other grounds by Garrett v. United States*, 471 U.S. 773 (1985); *see also United States v. Thevis*, 665 F.2d 616, 638–40 (5th Cir. 1982), *superseded on other grounds by* Fed. R. Evid. 804(b)(6). That authority rests with the executive branch. *Thevis*, 665 F.2d at 638–40; *Pillsbury Co. v. Conboy*, 459 U.S. 248, 261 (1983). Recognizably, we have "suggested without deciding that the federal constitution may in some extraordinary circumstances require either defense witness immunity or some remedial action by a district court to protect a defendant's right to a fair trial." *Chagra*, 669 F.2d at 258; *see also United States. v. Follin*, 979 F.2d 369, 374 (5th Cir. 1992); *Brooks*, 681 F.3d at 711 ("At most this Court has left open the possibility that immunity may be necessary to stem government abuse."); *cf. United States v. Bustamante*, 45 F.3d 933, 943 (5th Cir. 1995) ("[A] defendant only has grounds to complain about the treatment of a witness's immunity when the government

is using its immunity privilege to unfairly skew the facts presented to the jury, thereby breaching the defendant's right to due process of law.").

Appellant's brief identifies two cases in which we have alluded to the prospect of an "extraordinary circumstances" carve-out to the rule against judicially-ordered immunity. Markedly, in those cases, this court rejected each basis put forth as having established the requisite extraordinary circumstances. *See Follin*, 979 F.2d at 374 (rejecting appellant's argument that the district court should have immunized a witness because his refusal to testify was the result of prosecutorial misconduct, where the record did not support the alleged misconduct); *Chagra*, 669 F.2d at 259–61 (rejecting appellant's argument that the constitutional rights to compulsory process and "to present a defense" override the rule against judicially-granted immunity); *see also Brooks*, 681 F.3d at 711 ("A district court may not grant immunity simply because a witness has essential exculpatory evidence unavailable from other sources." (citation omitted)).

At bottom, deviation from the rule against judicially-ordered immunity is a confined measure that could potentially come to fruition under extraordinary circumstances to thwart government abuse. Here, the district court declined to immunize Romero at Appellant's request, reasoning that Appellant "failed to make a showing of 'extraordinary circumstances.'" We find no abuse of discretion in that decision. Appellant's brief conclusively states that judicially-ordered immunity was warranted because the Government refused to immunize Romero to dissuade him from testifying to their so-called coercive tactics. This interpretation misrepresents the reality of why the Government, as well as the district court, would not grant immunity to Romero. Per the district court's opinion, "there were innumerable problems with compelling Romero to testify." As mentioned above, Romero's testimony could have been consistent with his prior statement implicating Villarreal in the kidnapping, thereby serving to inculpate Villarreal at trial.

The district court was fittingly troubled by the prospect of immunizing a defendant's witness for testimony that could effectively aid in convicting the defendant. Surely, that is not the type of extraordinary circumstance envisioned by our case law that would supersede the rule against a district court granting immunity. Alternatively, Romero could have contradicted his prior statement and said Villarreal was not involved in the kidnapping or that he has no knowledge of Villarreal's involvement. Even if this isolated confession would have been remarkably exculpatory for Villarreal considering all testimony at his trial, which is doubtful, Appellant's desire to elicit that testimony alone does not justify the district court extending a grant of immunity. *See Brooks*, 681 F.3d at 711.

Therefore, the district court did not exceed its discretion when it abided by our general rule against judicially-ordered immunity because no extraordinary circumstances existed to warrant immunizing Romero.

**V**

Appellant also contends the district court erred by not dismissing the indictment. Appellant reasons that the district court's exclusion of the interview recording and Romero's testimony, combined with the court and the Government's refusal to immunize Romero, contravened Villarreal's due process rights. We need not resolve the standard of review in this case as the outcome is the same under either abuse of discretion or de novo review.

Appellant's argument fails for virtually the same reasons stated above. As support for asserting that Villarreal's indictment should have been dismissed, Appellant repeats his contention that Romero's testimony and the interview recording were "the best evidence to show how the government intimidated, coerced, or pressured potential witnesses to incriminate Villarreal." Appellant says the district court's unwillingness to allow this evidence "deprived Villarreal of due process and a fair trial, leaving no other fair

remedy but for the district court to dismiss the indictment against him." But as previously discussed, the interview recording was not relevant for Appellant's intended aim: propounding a farfetched proposition that witnesses in Villarreal's trial were sweepingly coerced into testifying against him. As to Romero's testimony, it was properly kept out in light of his Fifth Amendment assertion against self-incrimination. Further, Appellant's argument that he was deprived of due process and a fair trial overlooks the fact that Appellant was free to examine any of the testifying witnesses on whether they were subject to coercive tactics by the Government, and did not. Appellant provides no authority persuading our view to the contrary. Thus, there was no error in the district court's decision not to dismiss the indictment.

## VI

Since the recording Appellant requested to use as evidence did not meet the relevancy threshold, the district court did not err by declining to admit it. Further, the district court acted within its discretion by sustaining Romero's assertion of the Fifth Amendment and refusing to immunize him, as the court sufficiently assessed the scope of Romero's testimony, and judicially-ordered immunity is reserved for extraordinary circumstances not presented in this case. Lastly, we see no reversible error in the district court's refusal to dismiss the indictment. Therefore, we AFFIRM.